IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WILLIAM D. TYREE,

       Plaintiff,

vs.                              No. CIV-05-532 MCA/LFG

DEPARTMENT OF TRANSPORTATION,
STATE OF NEW MEXICO,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant Department of Transportation, State of New Mexico's Motion for Summary Judgment* [Doc. 32], filed March 6, 2006. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants Defendant's motion for summary judgment with respect to Counts I and III of the *Complaint* and declines to exercise supplemental jurisdiction over the state-law claim asserted in Count IV of the *Complaint*.

## I. BACKGROUND

On May 13 2005, Plaintiff William D. Tyree filed his *Complaint for Damages from Race and Age Discrimination, Retaliation and Breaches of an Implied Contract of Employment* [Doc. 1]. In his *Complaint*, Tyree, a Caucasian male employee of Defendant New Mexico Department of Transportation ("NMDOT") alleged that NMDOT discriminated against him on the basis of his race, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*

(Count I); discriminated against him on the basis of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Count II); retaliated against him, in violation of Title VII, 42 U.S.C. § 2000e *et seq.* (Count III); and breached an implied contract of employment (Count IV).  By *Stipulated Order* entered March 23, 2006, this Court dismissed Count II.  [Doc. 36].  As to the remaining counts, the following facts are taken from Tyree's *Complaint* or are undisputed by the parties and, thus, are accepted as true for purposes of NMDOT's summary-judgment motion.

Tyree began work with NMDOT in December 1988.  By December 1997, Tyree had become foreman of the District III Tijeras Patrol, a work group or crew assigned to and with responsibility for an area including Bernalillo, Torrance, and Santa Fe Counties.  As foreman, Tyree exercised supervisory authority over the operations and assignments of the Tijeras Patrol.  [Doc. 1 at 2].  The number of workers in Tyree's crew fluctuated, but it usually consisted of about eight or nine individuals.  [Doc. 33; Exh. A, "Dec. 2, 2005 deposition of William D. Tyree," at 16-17].  Tyree's crewmembers were of diverse racial backgrounds.  [Doc. 1 at 2].

Over time, a number of Tyree's crewmembers became disenchanted with his decision-making and supervision.  Consequently, on October 2, 2003, six former and current members of Tyree's crew[1] filed a *Report of Violations/Complaint* against Tyree with NMDOT ombudsman Jose Morfin.  [Doc. 33; Exh. C].  The *Report of Violations/Complaint* consisted

---

[1] The six complaining crewmembers were Matthew Gutierrez, Phillip Mora, Fabian Barela, Michael Tenorio, Clarence Romero, and Shane Kayser.  [Doc. 33; Exh. C].

of three pages' worth of single-spaced examples of Tyree's alleged improper actions and comments, plus a "summation."  On the cover page, the six crewmembers explained that they felt "that [they had] been exposed to unsafe working conditions, retaliation, a hostile working environment, racism, unlawful discrimination, sexual harassment, and offensive conduct." [Id.; Exh. C at 1].  By letter dated October 10, 2003, Louis Lopez was assigned to investigate the crewmembers' allegations of discrimination.[2]  [Doc. 33; Exh. G].  This assignment letter advised Lopez that his NMDOT point of contact was Vera Cushman, Bureau Chief for the Office of Equal Opportunity Programs.  [Id.].  At the time the crewmembers' allegations were made and pending the completion of the investigations into them, Tyree was transferred from the Tijeras Patrol to the Belen Patrol, "with the main reason being safety, the safety of both [Tyree] and the employees at that crew."  [Doc. 40; Exh. 2, "Feb. 10, 2006 depo. of Kathy Trujillo" at 25].  The initial move to the Belen Patrol was intended to be temporary. [Id.; Exh. 4, "Dec. 16, 2005 depo. of Leland Riley" at 25-26].

On December 22, 2003, Cushman forwarded to Tom Raught, District III Engineer, a document captioned *Report of Findings: Crew Members (Past and Present) Tijeras Patrol 43-57 vs. New Mexico Department of Transportation,* ("*Report of Findings*") as well as one titled *Supplement to Report of Findings: Tijeras Patrol Investigation* ("*Supplement to Report of Findings*").  [Doc. 33; Exh. H].  The *Report of Findings* detailed 14 allegations that had

---

[2] Two other separate investigations were conducted.  Allegations that Tyree had engaged in equipment mismanagement were  investigated by the Office of the Inspector General, [Doc. 33; Exh. E], while allegations of Tyree's safety violations were investigated by NMDOT's Risk Management Bureau.   [Id.; Exh. F].

been made against Tyree and concluded that, while the complaining crewmembers had failed to demonstrate that they had been subjected to disparate treatment, they had shown that Tyree had created a hostile work environment based on sexual orientation, national origin, and race. [Id.; Exh. H at 8]. The conclusion that there existed a hostile work environment was based on findings that Tyree had (1) referred to Assistant District Engineer Kathy Trujillo as a "dyke;" (2) referred to Mexican-Americans as wetbacks, wets, and cockroaches; (3) used the terms "nigger," "nigger-rigging," and "little nigger;" (4) made racial remarks about African-American crewmember Ian Minter and his girlfriend; and (5) more likely than not referred to crewmember Shane Kayser as "nigga" and made disparaging remarks about Kayser's wife. [Doc. 33; Exh. H at 8]. The *Supplement to Report of Findings* concluded that Tyree had more likely than not made a statement to a colleague implying that, upon his return to the Tijeras Patrol, Tyree intended to retaliate against his crewmembers. The *Supplement to Report of Findings* recommended that this statement be taken into account in determining what action to take against Tyree. [Id.; Exh. H, "Supplement to Report of Findings: Tijeras Patrol Investigation" at 2].

The *Report of Findings* noted that, despite the fact that Tyree had been disciplined in the past for abusive language and inappropriate behavior, he continued to engage in behavior inappropriate for a supervisor even after receiving counseling. For that reason, the *Report of Findings* recommended that any action against Tyree take into account that "past disciplinary action ha[d] not been sufficient to change his behavior." [Doc. 33; Exh. H at 9]. Evidence of this past disciplinary action appears in the record in the form of two intra-

departmental memoranda from supervisor Leland Riley to Tyree.

The first intra-departmental correspondence is dated June 10, 2002 and was sent from Riley to Tyree as a follow-up letter to a meeting of the same day concerning reports of "intimidating, antagonistic, and/or belittling comments made to employees and supervised by [Tyree]." [Id.; Exh. P]. Riley's letter advised Tyree that

> [o]n several occasions, we have received reports of this same type of behavior and inappropriate conduct. *As you have been made aware on previous occasions*, the Department does not condone this type of supervision/management style. It is inappropriate behavior of a supervisor to raise your voice, use curse words, or to intimidate and/or belittle an employee in private or in the presence of other employees. Your assertiveness has been construed as aggressiveness, especially when you attempt to intimidate coworkers with your selection of degrading words. *You have created an intimidating work environment.*

[Id. (emphasis added)]. In an effort to have Tyree "treat others with respect and dignity at all times[,]" Riley instructed him to attend outside classes on dealing with interpersonal conflict in the workplace and on anger management. [Id.]. Riley's letter closed with a warning to Tyree that he was being placed on notice that if his behavior did not improve, or if he violated any other standards of performance and/or conduct, further disciplinary action would be taken. [Id.].

On June 24, 2002, Riley sent Tyree another intra-departmental correspondence as a follow-up letter to a meeting held June 21, 2002 concerning comments made by Tyree to one of his employees and directed toward the employee's wife. In that letter, Riley advised Tyree that his comments were considered inappropriate and unwelcome and that, by then

5

sharing those comments via e-mail, Tyree had "violat[ed] Administrative Directive 408 on

Internet Access and Use and 505 Employment Discrimination dealing with offensive material

and conduct." [Doc. 33; Exh. P at 2]. Riley informed Tyree that

> [y]ou must ensure that you are a positive role model, by
> examining your personal behavior so that it is not misinterpreted
> as intentionally harmful or harassing. Maintaining a work
> environment free from behavior which is unwelcome and which
> creates discomfort for employees under your supervision, is
> important for maximum productivity, teamwork, and high
> morale.

[Id.]. Like the letter of June 10, this letter also closed by warning Tyree that he was being

placed on notice that if his behavior did not improve, or if he violated any other standards

of performance and/or conduct, further disciplinary action would be taken. [Id.].

On or about January 14, 2004, and as a result of the investigations conducted in

response to his crewmembers' *Report of Violations/Complaint*, Tyree was notified that he

was reassigned transferred to the Belen Patrol.[3] [Doc. 33; Exh. I]. As a consequence of the

reassignment, Tyree was relieved of his supervisory duties. [Doc. 1 at 4]. On January 27,

2004, Tyree was issued a *Notice of Contemplated Disciplinary Action* in which Tom Raught

announced his intention to suspend Tyree for 30 days without pay based on the results of the

---

[3] The order making Tyree's transfer permanent was signed and dated February 12, 2004
and stated that Tyree was being transferred "to meet the needs of the District in Maintenance for
crew 43-54 (Belen)." [Doc. 33; Exh. K; see also Doc. 40; Exh. 2, Trujillo depo. at 34]. Also,
although the transfer order was not signed until February 2004, Tyree was actually moved to
Belen in the fall of 2003, soon after the crewmembers' complaints came to light and while
investigations were being conducted. The main reason for the transfer pending the investigations
was explained as "safety, the safety of both [Tyree] and the employees at that crew." The transfer
initially was intended to be temporary. [See Doc. 33; Exh. D, Trujillo depo. at 22, 25; Doc. 40;
Exh. 4, Riley depo. at 25-26].

three investigations into Tyree's conduct and behavior.  [Doc. 33; Exh. J].  This Notice was rescinded by letter dated February 19, 2004 after Raught, at the request of Tyree's attorney, agreed to conduct a follow-up investigation.  [Id.; Exh. L].  At the conclusion of the follow-up investigation, which was conducted by Vera Cushman, Raught again sent Tyree a *Notice of Contemplated Disciplinary Action*, announcing his intention to suspend Tyree for 30 days without pay.  This second Notice was dated July 15, 2004.  [Id.; Exh. M].  On August 10, 2004, Tyree filed a *Charge of Discrimination* with the Equal Employment Opportunity Commission ("EEOC"), in which he stated the following: "*I [am] being treated differently in the terms and conditions of my employment i.e., denied promotion and discipline.  I am also being subjected to harassment and I have been retaliated against for having opposed discrimination practices*."  [Id.; Exh. N].  On August  25, 2004, a hearing was held on the *Notice of Contemplated Disciplinary Action*.  [Doc. 1 at 5].  On September 30, 2004, Tyree and his attorney met with Raught to discuss the proposed 30-day suspension.  [Doc. 33 at 5].

On October 15, 2004, Raught issued a *Notice of Final Disciplinary Action* in which he announced his decision to suspend Tyree for three days without pay on the basis of the results of the three investigations of Tyree's conduct and behavior, as well as Cushman's follow-up investigation.  [Doc. 33; Exh. O].  At his deposition, Raught explained that one reason the suspension was reduced from 30 days to 3 days was that the investigation into Tyree's actions had "dragged on."  But he also confirmed that "the [investigative] findings are basically what was driving this stuff."  [Doc. 40; Exh. 1; "Dec. 9, 2005 depo. of Thomas

Raught" at 102]. Tyree served the three-day suspension and did not appeal it. [Id.; Exh. A, Tyree depo. at 80-81].

On May 13, 2005, Tyree filed his *Complaint for Damages from Race and Age Discrimination, Retaliation and Breaches of an Implied Contract of Employment* [Doc. 1]. On March 6, 2006, NMDOT filed *Defendant Department of Transportation, State of New Mexico's Motion for Summary Judgment* in which it contends that (1) Tyree has presented no evidence to support his claim of reverse discrimination; (2) Tyree has not made a prima facie case of retaliation; and (3) NMDOT did not breach an implied contract of employment. [See Docs. 32, 33].

## II. ANALYSIS

### A. Summary Judgment Standard, Fed.R.Civ.P. 56

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Nor will unsupported conclusory allegations create a genuine issue of fact. Harrison v. Wahatoyas, L.L.C., 253 F.3d 552, 557 (10th Cir. 2001). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Judgment is appropriate as a matter of law if the

nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

## B. Title VII, 42 U.S.C. § 2000e, *et seq.*

Title VII makes it unlawful for an employer to, among other things, "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1). The plaintiff in a Title VII action carries the initial burden of establishing a prima facie case of racial discrimination.  If the plaintiff does so, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the employer satisfies its burden, the

plaintiff must then demonstrate that the legitimate reason is merely a pretext for racial discrimination.  Mattioda v. White, 323 F.3d 1288, 1291 (10th Cir. 2003).  One way the plaintiff may do this is by demonstrating that "'he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.'"  Salguero v. City Of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004) (*quoting* Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir.2000)).  The plaintiff may also establish pretext by showing that the proffered reason for the defendant's action is so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief.  Miller v. Automobile Club Of New Mexico, Inc., 420 F.3d 1098, 1123 (10th Cir. 2005).

### 1. Reverse Race Discrimination

Title VII prohibits discrimination against Caucasians ("reverse discrimination") as well as non-Caucasians.  See McGarry v. Board of County Com'rs of County of Pitkin, 175 F.3d 1193, 1199 (10th Cir. 1999).  In a reverse-discrimination case, however, the McDonnell Douglas presumption that is valid when a plaintiff belongs to a disfavored group—that unless otherwise explained, discrimination is more likely than not the reason for the challenged decision—is not necessarily justified when the plaintiff is a member of an historically favored group.  Notari v. Denver Water Dept., 971 F.2d 585, 589 (10th Cir. 1992).  For that reason, a reverse-discrimination plaintiff seeking to obtain the benefit of the McDonnell Douglas presumption "must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority."  Id.; see also Mattioda, 323

F.3d at 1292.

A reverse-discrimination plaintiff who is unable to establish the background circumstances necessary to trigger the McDonnell Douglas presumption is required to present evidence "sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff." Notari, 971 F.2d at 590.  As with a straightforward claim of racial discrimination, if the reverse-discrimination plaintiff makes his prima facie showing and the defendant/employer articulates a legitimate, nondiscriminatory reason for the challenged action, the plaintiff must then come forward with evidence showing that the defendant's reason is a pretext for racial discrimination. Mattioda, 323 F.3d at 1291.

In this case, Tyree has neither presented direct evidence of discrimination nor has he alleged and established background circumstances supporting the inference that NMDOT "is one of those unusual employers who discriminates against the majority."  Notari, 971 F.2d at 589; see also Doc. 38 at 11-12 ("Tyree has chosen to establish his *prima facie* case through the presentation of indirect evidence that shows that Defendant acted to detrimentally affect the terms and conditions of Tyree's employment because he is Caucasian.").  The Court thus must consider whether Tyree has produced evidence sufficient to support a reasonable probability that, but for his status, Tyree would not have been transferred from the Tijeras Patrol to the Belen Patrol. See id. at 590.  The Court concludes that Tyree has not done so and, even if he had, NMDOT has articulated legitimate, nondiscriminatory reasons for the transfer, which Tyree has not discredited as pretextual.

11

See Mattioda, 323 F.3d at 1291.

Tyree maintains that NMDOT's discriminatory motive for the transfer can be inferred from the following: (1) a number of his crewmembers did not confirm or substantiate the allegations set forth in the *Report of Violations/Complaint*; (2) Raught and Trujillo, who admitted that they decided to transfer Tyree because it was be easier to transfer one employee than to move the three complaining crewmembers who remained at the time of the transfer, never explained why transferring Tyree was easier (leading to the inference that NMDOT "simply entered into a balancing test [with,] on one side of the scales[] one Caucasian, and on the other [three] Hispanics"); and (3) NMDOT's additional reason for transferring Tyree—safety—finds no support in the record. [Doc. 38 at 13-14].

The record evidence reveals that the decision to transfer Tyree to the Belen Patrol was made in the fall of 2003, immediately after the six crewmembers' complaints came to light, and was intended to be a temporary move while investigations into Tyree's conduct were ongoing. [See Doc. 40; Exh. 2, Trujillo depo. at 22; Exh. 4, Riley depo. at 25-26]. Once the investigation into Tyree's treatment of his employees was completed, Vera Cushman, by intra-departmental correspondence dated December 22, 2003, forwarded to Tom Raught a *Report of Findings* and a *Supplement to Report of Findings* on the crewmembers' complaints. [Doc. 33; Exh. H]. While the crewmembers' *Report of Violations/Complaint* detailed 34 separate complaints, [see Doc. 33; Exh. C], the *Report of Findings* explained that 14 allegations of "harassment and differential treatment on the bases of sex, race, sexual

orientation, and disability" had been investigated.[4]   [Id.; Exh. H at 1].   Of those 14

allegations, 4 were found to have been supported by the evidence and 1 was deemed "more

likely than not" to have occurred.  [Id.; Exh. H at 8].

The five allegations found to have been supported by the evidence, or more likely than

not to have occurred, were that Tyree had (1) referred to Kathy Trujillo as a "dyke;"

(2) referred to Mexican-Americans as wetbacks, wets, and cockroaches; (3) used the terms

"nigger," "nigger-rigging," and "little nigger;" (4) made racial remarks about African-

American crewmember Ian Minter and his girlfriend; and (5) referred to crewmember Shane

Kayser as "nigga" and made disparaging remarks about Kayser's wife. [Doc. 33; Exh. H at

8]. Similarly, the conclusion of the *Supplement to Report of Findings* was that the

complained-of conduct investigated therein—that Tyree had made a statement to the effect

that, upon his return to the Tijeras Patrol, he intended to retaliate against his

crewmembers—also more likely than not occurred.  [Id.; Exh. 8, "Supplemental to Report

of Findings: Tijeras Patrol Investigation"].

The *Report of Findings* further noted that Tyree had been counseled in the past for

inappropriate behavior and the use of abusive language.  Indeed, the record evidence reveals

that on June 10, 2002, Tyree's supervisor, Leland Riley, sent Tyree an intra-departmental

correspondence under the subject line "Inappropriate Behavior & Conduct Unbecoming of

A Supervisor." [Doc. 33; Exh. P].  This memo was intended as a follow-up letter to a June

---

[4]  Allegations that Tyree had engaged in equipment mismanagement were  investigated by
the Office of the Inspector General, [Doc. 33; Exh. E], while allegations of Tyree's safety
violations were investigated by NMDOT's Risk Management Bureau.   [Id.; Exh. F].

10, 2002 meeting held with Tyree "concerning reports of intimidating, antagonistic, and/or a [sic] belittling comments made to employees supervised by [Tyree]." [Id.].  The memo stated that Tyree had been made aware "on previous occasions" that NMDOT did not condone his style of supervision/management, and informed Tyree that "[his] assertiveness ha[d] been construed as aggressiveness, especially when [he] attempt[ed] to intimidate coworkers with [his] selection of degrading words." [Id.].  Riley's memo closed with a warning to Tyree that he was being placed on notice that if his behavior did not improve, or if he violated any other standards of performance and/or conduct, further disciplinary action would be taken. [Id.].  Two weeks later, on June 24, 2004, Riley sent Tyree another intra-departmental correspondence as a follow-up letter to a June 21, 2002 meeting concerning comments made by Tyree to one of his workers and directed at the worker's wife.  This memo also closed with a warning to Tyree that he was being placed on notice that if his behavior did not improve, or if he violated any other standards of performance and/or conduct, further disciplinary action would be taken. [Id.].

Through his deposition, Riley testified that at least two of Tyree's crewmembers had complained to him about Tyree's hostile manner, *i.e.*, Tyree's use of jokes, vulgarism, and profanity, and smart and snide comments.  [Doc. 40; Exh. 4, Riley depo. at 18-19]. Acknowledging that he (Riley) also joked and used profanity in the workplace, Riley explained that what differentiated Tyree's behavior was Tyree's tendency to "single individuals out" and direct his comments toward specific people.  [Id. at 55-56].  Riley testified that he spoke to Tyree about how Tyree was treating his crewmembers and tried to

14

coach Tyree on professionalism.  [Id. at 24].

Through his deposition, Shane Kayser, a Caucasian crewmember who was one of the six crewmembers to have contributed to and signed the *Report of Violations/Complaint*, testified that Tyree had referred to him as "nigga," which Kayser found offensive.  Kayser also took offense to racial comments that Tyree made about crewmember Ian Minter, because Kayser interpreted those comments as "kind of, you know, making fun of [Minter] being black."  [Doc. 41; Attached "Dec. 9, 2005 depo. of Shane Kayser" at 35].  Kayser testified that he heard Tyree refer to Hispanics and women in derogatory terms, which made him uncomfortable, but explained that he said nothing about it to Tyree because he "always noticed like if you ever told Mr. Tyree something that he would, you know, try to get back at you one way or the other."  [Id. at 37].

The record evidence also demonstrates that the decision to transfer Tyree to the Belen Patrol was not based solely on the information contained in the *Report of Findings* and *Supplement to Report of Findings*.  NMDOT also investigated allegations that Tyree had engaged in equipment mismanagement and had committed various safety violations, some of which were considered quite serious.  [See Doc. 33; Exhs. E, F].  Through his deposition, Tom Raught testified that, while he found some of the allegations against Tyree relating to equipment mismanagement to be "of no consequence," he *did* have concerns that Tyree had put certain department equipment to personal use.  [See Doc. 40; Exh. 1, "Dec. 9, 2005 depo. of Tom Raught" at 34 ("I had some concerns about the welding on his personal stuff.  There were some things I found to be of no consequence[.]")].  Raught also testified that the safety

investigation revealed that the Tijeras Patrol, of which Tyree was foreman, had, among other things, failed to dispose of oil in accordance with federal regulations, which Raught considered serious because of the potential for oil to seep into groundwater.  [Id. at 28].

As previously explained, Tyree bears the burden of presenting evidence sufficient to support a reasonable probability, that but for his status, he would not have been transferred from the Tijeras Patrol to the Belen Patrol.   See Notari, 971 F.2d at 590.  The Court concludes, however, that Tyree's evidence fails to show that his race motivated NMDOT's decision to transfer him.   Moreover, NMDOT has articulated several legitimate, nondiscriminatory reasons for the transfer.  NMDOT represents that the decision to transfer Tyree was based on the information contained in the *Report of Findings* and *Supplement to Report of Findings*, as well as the determination that Tyree had engaged in equipment mismanagement and had committed various safety violations.  Tyree also was transferred because of the need to defuse the situation among Tyree and his crewmembers, and because of NMDOT's desire to maintain an efficient and productive work force.[5]   In Kathy Trujillo's words, "*it was a decision that was based on maintaining an efficient and productive work force in maintenance operations, it was the prudent thing to do in order to maintain that level of work*."  [Doc. 33; Exh. D, Trujillo depo. at 25, 28, 50].

Finally, Tyree has not demonstrated that NMDOT's proffered reasons are pretextual

---

[5]  The record evidence also supports the inference that repeated written reprimands of the sort issued by Leland Riley on June 10, 2002 and June 24, 2002 and warning Tyree that he risked possible disciplinary action had proven ineffective at persuading Tyree to change his behavior. [See Doc. 33; Exh. H at 9; see also Exh. P].

or unworthy of belief.  <u>See</u> <u>Miller</u>, 420 F.3d at 1123.  Tyree alleges that the decision to transfer him but not the complaining crewmembers was nothing more than "a discriminatory 'beauty contest.'" [Doc. 38 at 13].   To the extent Tyree contends that this decision demonstrates pretext by showing that he was treated differently from other similarly situated employees—his crewmembers—who also used profanity and made lewd jokes, racial and ethnic slurs, and insulting comments in the workplace, his argument fails as a matter of law. <u>See</u> <u>Watts v. City of Norman</u>, 270 F.3d 1288, 1293 (10th Cir. 2001) ("Under [Tenth Circuit] precedent, employees may not be 'similarly situated' when one is a supervisor and the other is not.").  For these reasons, NMDOT's motion for summary judgment will be granted as to Tyree's claim of reverse discrimination.

### 2. Retaliation

Just as Title VII prohibits discrimination on the basis of race, so too does it "forbid[] retaliation against an employee because [the employee] has 'opposed any practice made unlawful by Title VII, or because [the employee] has 'participated . . . in an investigation, proceeding, or hearing under this subchapter.'"  <u>Stover v. Martinez</u>, 382 F.3d 1064, 1070 (10th Cir. 2004) (<i>quoting</i> 42 U.S.C. § 2000e-3(a)).  As with allegations of racial discrimination, where there is no direct evidence of retaliation, the Court analyzes a retaliation claim under the <u>McDonnell Douglas</u> burden-shifting framework.  <u>See</u> <u>Stover</u>, 382 F.3d at 1070.  To state a prima facie case of retaliation, the plaintiff must demonstrate that (1) he engaged in protected opposition to discrimination; (2) the defendant took an adverse employment action against him; and (3) there exists a causal connection between the

protected activity and the adverse action.  Id. at 1071.

Although the Tenth Circuit liberally defines the phrase "adverse employment action," it has not "delineated precise metes and bounds, preferring instead a more flexible, case-by-case approach." Chavez v. New Mexico, 397 F.3d 826, 838 (10th Cir. 2005) (*citing* Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir.1999)). To be proscribed by Title VII, however, retaliatory conduct must alter the employee's compensation, terms, conditions, or privileges of employment, or adversely affect his status as an employee. Sanchez v. Denver Pub. Sch., 164 F.3d 527, 533 (10th Cir.1998).  Examples of actions that effect a significant change in employment status include hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  Medina v. Income Support Div., New Mexico, 413 F.3d 1131, 1136 (10th Cir. 2005).

In this case, Tyree alleges that he engaged in two instances of protected opposition to discrimination.  He first contends that after his crewmembers submitted their *Report of Violations/Complaint*, he complained to his supervisors, particularly Leland Riley, that he was being discriminated against because he is Caucasian.  [Doc. 1 at 8-9; see also Doc. 38 at 16-17].  Tyree argues that his transfer, which occurred shortly thereafter, amounts to an adverse employment action.  Tyree also maintains that he engaged in protected activity when he filed his *Charge of Discrimination* with the EEOC on August 10, 2004, and that the decision to suspend him for three days, which was made shortly after his filing, also amounts to an adverse employment action. NMDOT does not dispute that Tyree's EEOC filing

18

constitutes protected action under Title VII.  [Doc. 33 at 11].

The filing of an administrative charge with the EEOC is a prerequisite to a civil suit under Title VII, and a claim will be deemed time-barred if it is not filed within 300 days of the alleged unlawful employment practice.  See Mascheroni v. Bd. of Regents of Univ. of California, 28 F.3d 1554, 1557 (10th Cir. 1994) (explaining that 300 days are allowed in "deferral states" such as New Mexico, where the EEOC defers to the enforcement efforts of a state agency empowered to undertake employment-discrimination investigations).  In National R.R. Passenger Corp. v. Morgan, the United States Supreme Court eliminated the "continuing violation" theory as applied to discrete acts of discrimination and held that because each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice, a plaintiff raising claims based upon retaliatory acts must file his or her administrative charge within the appropriate time period.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114, 123 (2002).  While this rule applied to bar the Morgan plaintiff from suing on claims for which no administrative remedy had been sought when the underlying incidents occurred more than 300 days prior to the filing of his EEO complaint, see id. at 106, the Tenth Circuit has held that "[t]he rule is equally applicable . . . to discrete claims based on incidents occurring after the filing of Plaintiff's EEO complaint."  Martinez v. Potter, 347 F.3d 1208, 1210-11 (10th Cir. 2003).  In no uncertain terms, the Tenth Circuit went on to state that "Morgan abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers[.]"  Id. at 1210.  Additionally, "Morgan implicitly overturns prior Tenth Circuit law in that plaintiffs are now

expressly precluded from establishing a continuing violation exception for alleged discrete acts of discrimination occurring [outside] the limitations period, even if sufficiently related to those acts occurring within the limitations period." Davidson v. America Online, Inc., 337 F.3d 1179, 1185 (10th Cir. 2003).

The rule set forth in Morgan applies to such discrete acts as termination, failure to promote, denial of transfer, or refusal to hire, which "are easy to identify." Morgan, 536 U.S. at 114. The Tenth Circuit has held that, under certain circumstances, disciplinary proceedings, such as the issuance of warning letters and reprimands, can constitute an adverse employment action. Medina, 413 F.3d at 1137 (explaining that a reprimand will only constitute an adverse employment action if it adversely affects the terms and conditions of the plaintiff's employment by, for example, affecting the likelihood that the plaintiff will be terminated; undermining the plaintiff's current position; or affecting the plaintiff's future employment opportunities). Moreover, at least one other circuit court has held that an employee reprimand constitutes a discrete act for purposes of Morgan and, thus, a distinct unlawful employment practice. Mems v. City of St. Paul, Dep't of Fire and Safety Servs., 327 F.3d 771, 785 (8th Cir. 2003).

In the instant action, Tyree filed his EEOC *Charge of Discrimination* on August 10, 2004. [Doc. 33; Exh. N]. On October 15, 2004, Tom Raught informed Tyree of his decision to suspend Tyree for three days, which decision constitutes one of the alleged adverse employment actions. [See Doc. 1 at 8, "Shortly after the EEOC filing, the DOT issued a decision finding that Tyree be suspended for three days . . . . This action constitutes an

adverse employment action for purposes of Title VII."].  Raught's decision to suspend Tyree

for three days is an easily identified, discrete instance of an adverse employment action for

which no administrative remedy was sought.  See Martinez, 347 F.3d at 1210.  Indeed,

Tyree, through his deposition, confirmed that he sought no administrative remedy, testifying

that he served his three-day suspension without appealing it.  [Doc. 33; Exh. A, Tyree depo.

at 80-81].  Accordingly, the Court determines that Morgan precludes Tyree from now

challenging NMDOT's decision to suspend him for three days.  The Court thus turns to

Tyree's other alleged instance of retaliation, i.e., the transfer from the Tijeras Patrol to the

Belen Patrol, which Tyree maintains occurred shortly after he complained to his supervisors

that he was being discriminated against because he is Caucasian.

A plaintiff may show that he engaged in protected opposition to discrimination by

showing that he complained informally to his supervisors. Medina, 413 F.3d at 1135-36.

Although Tyree alleges that he complained to his supervisors, particularly Leland Riley, that

he was being discriminated against because he is Caucasian, the Court can discern no

evidence in the record to support this contention.  See  Harrison, 253 F.3d at 557

("Unsupported conclusory allegations  . . . do not create a genuine issue of fact.").  In fact,

Tyree's assertion is directly contradicted by the deposition testimony of Leland Riley, who

explained that, on May 24, 2005, he signed an EEOC affidavit in which he stated the

following: "*At no time prior to or since this transfer to the Belen patrol has Mr. Tyree or

anyone else informed me of allegations of discrimination or harassment based on his age

or race or retaliation against Mr. Tyree.*"  [Doc. 40; Exh. 4, Riley depo. at 32].  Because

Tyree has not shown that he engaged in protected opposition to discrimination, Tyree has not established a prima facie case of retaliation. Again, however, even if he had, NMDOT has articulated several legitimate, nondiscriminatory reasons for transferring Tyree, which Tyree has not shown to be pretextual or unworthy of belief. NMDOT's reasons for transferring Tyree are set forth above in Section II.B.1. For these reasons, NMDOT's motion for summary judgment will be granted as to Tyree's claim of retaliation.

### C. Tyree's State-Law Claim—Breach of an Implied Contract of Employment

In Count IV of his *Complaint*, Tyree has asserted a claim for breach of implied contract of employment. In asserting his breach-of-contract claim, Tyree invokes this Court's supplemental jurisdiction. [See Doc. 20, "Initial Pretrial Order" at 1 ("This action arises under Title VII, 42 U.S.C. § 2000e, the ADEA, 29 U.S.C. § 621, and New Mexico common law for breach of implied contract.")].

Section 1367 of Title 28 of the United States Code provides, in pertinent part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a). Pursuant to subsection (c), however, the Court may decline to exercise its supplemental jurisdiction if, among other things, it has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3). In other words, once "the bases for federal subject matter jurisdiction have been extinguished[,] the district court may decline to exercise continuing 'pendent or supplemental jurisdiction over [the] plaintiff's state

22

claims." Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1236 (10th Cir. 1998) (dismissing without prejudice plaintiff's claims for, *inter alia*, breach of contract after having entered summary for defendant on plaintiff's First and Fourteenth Amendment claims); see also Taylor v. Meacham, 82 F.3d 1556, 1564 n.1 (10th Cir. 1996) ("Once a federal court dismisses claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state law claims.").

In the instant action, the entry of summary judgment in favor of NMDOT on Tyree's Title VII reverse-discrimination and retaliation claims extinguishes the basis for federal subject matter jurisdiction. See Lancaster, 149 F.3d at 1236. Accordingly, the Court declines to exercise its supplemental jurisdiction over Tyree's breach-of-implied-contract claim. See 28 U.S.C. § 1367(c)(3). In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction. See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995). The Court is not convinced that these factors weigh in favor of retaining jurisdiction. The employment policies which are the subject of Tyree's breach-of-contract claim are those of a state agency and, thus, creatures of state law best suited to adjudication in a state court. Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary. See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990). In addition, the Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to Tyree's state-law claim, as 28 U.S.C. § 1367(d) may provide for the tolling of any limitations period

regarding this claim.  For these reasons, Tyree's claim for breach of implied contract of employment will be dismissed without prejudice.  See Lancaster, 149 F.3d at 1236 (where district court had entered summary judgment for defendant on plaintiff's federal claims, affirming district court's decision to dismiss without prejudice plaintiff's state-law claims).

## III. CONCLUSION

For the reasons stated herein, the Court concludes that there exist in this matter no genuine issues of material fact to prevent entry of summary judgment for Defendant NMDOT on Tyree's claims of reverse discrimination and retaliation.  Because entry of summary judgment on those claims extinguishes any basis for federal subject matter jurisdiction, the Court declines to exercise Tyree's remaining state-law claim.  For these reasons, the Court will grant *Defendant Department of Transportation, State of New Mexico's Motion for Summary Judgment* [Doc. 32] as to Tyree's reverse-discrimination and retaliation claims and dismiss without prejudice the claim for breach of contract.

**IT IS, THEREFORE, ORDERED** that *Defendant Department of Transportation, State of New Mexico's Motion for Summary Judgment* [Doc. 32] is **GRANTED** as to Plaintiff William D. Tyree's claims for reverse racial discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.* (Count I), and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.* (Count III);

**IT IS FURTHER ORDERED** that Plaintiff William D. Tyree's claim for racial discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, (Count I), is **DISMISSED WITH PREJUDICE;**

**IT IS FURTHER ORDERED** that Plaintiff William D. Tyree's claim for retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq*., (Count III), is **DISMISSED WITH PREJUDICE;**

**IT IS FURTHER ORDERED** that Plaintiff William D. Tyree's state-law claim for breach of implied employment contract (Count IV) is **DISMISSED WITHOUT PREJUDICE;**

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for TUESDAY, June 6, 2006, at 9:00 a.m., the **CALL OF THE CALENDAR** set for THURSDAY, July 6, 2006, at 9:00 a.m., and the **JURY SELECTION/TRIAL** set for TUESDAY, July 11, 2006, at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED** this 26th day of May, 2006, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge